## The Pennsylvania Railroad Company *versus* Henderson.

1. In an action against a railroad company, the declaration alleged that the death for which the suit was brought, was caused by negligence in *not allowing a safe and convenient platform or way, and sufficient time to get into the cars, and causing an engine to run alongside the cars, which killed the deceased.* *Held*, that delay in the arrival of the train in which the deceased was to go, not being alleged in the declaration, was not a cause of action, but was a circumstance bearing on the question of negligence.

2. The court below refused to charge that if the deceased "was largely indebted at the time of his death, the plaintiff would have no pecuniary interest in his life until his debts were paid; and the jury, in estimating the pecuniary value of the life of the plaintiff's husband, must, if they can, fix a period in his life, if he had lived, when he would have acquired property beyond his debts." *Held* not to be error.

3. On the question of negligence, evidence was proper that the next day after the accident the agent of the company telegraphed to the superintendent, that the platform should be removed, and it was removed the next day.

4. On the question of damages, the plaintiff might ask a witness "from his knowledge of decedent's age, habits, health and physical condition, how long he would have been useful to his family."

5. The right of action which a wife has for the death of her husband, caused by negligence, is different from that which would have accrued to him had he survived the injury, and excludes all questions of exemplary damages, the damages being simply compensatory for the loss sustained by the surviving family.

6. A drover transporting live-stock in the cars of a railroad company, for which he paid freight, received a ticket to "pass the bearer in charge of his stock," on which was endorsed, "The person accepting this free ticket assumes all risk of accidents, and expressly agrees that the company shall not be liable, under any circumstances, whether by the negligence of their agents or otherwise, for any injury to the person, or for any loss or injury to the personal property of the person using this ticket." *Held*, that the drover was not a gratuitous, but a paying, passenger. *Held*, also, that the endorsement was no excuse for negligence.

ERROR to the Court of Common Pleas of *Indiana county*, in which this was an action on the case by Catharine Henderson, the widow of Joseph A. Henderson, and John F. Henderson and others, children of said Joseph, against the Pennsylvania Railroad Company, for causing the death of said Joseph.

The declaration alleged that, on the request of the company and in consideration that Henderson would engage to transport certain live-stock from Indiana to Philadelphia on their railroad, and to take a seat in their cars to Philadelphia for a reasonable reward, the company agreed to convey him and his stock to Philadelphia, and to pass him safely from the cars on the Indiana branch to the cars on the main line, without putting him in any peril by the negligence or unskilfulness of the company or their servants; but that the company did not take due care and diligence and skill in allowing him a safe and convenient way and sufficient time to get into the cars on the main line, but carelessly and negli-

[Pennsylvania Railroad Co. *v.* Henderson.]

gently caused an engine to be so run whilst he was attempting to get into the cars as to throw him down and kill him.

It appeared that Henderson, on the trip on which he was killed, shipped some live-stock from Indiana to Philadelphia and received a "*drover's pass*," being a ticket given to the person in charge of stock to the same place where the stock goes, there being no charge for the ticket, and the stock being charged the same freight whether any one goes with it or not.

The ticket is in this form:—

" Pennsylvania Railroad. Not Transferable. Good for three days only. Conductor of Passenger Car attached to eastern bound stock train, will pass the bearer, in charge of his stock, in cars No. from to 18 Agent." On the back of ticket: ☞ "The person accepting this *free ticket* assumes all risks of accidents, and expressly agrees that the company shall not be liable, under any circumstances, whether of negligence by its agents, or otherwise, for any injury to the person, or for any loss or injury to the personal property of the party using this ticket. ☞ Agent of the P. R. R. Co. will observe the following rules in issuing drovers' passes: one pass to either 1 or 2 car-loads of stock; two for not less than 4 car-loads; three for not less than 6 car-loads, and four for 10 car-loads or more. Passes in all cases to be dated when issued." The stock was manifested on 21st July 1859, to Amos Thomas, and $115 prepaid.

At the intersection of the Indiana Branch with the main line, there was a platform between the two tracks about six feet two inches wide, and passenger cars on the tracks so overlapped it, that cars being opposite to each other on each track would leave a space between them of but about two feet seven and a half inches.

Henderson had come down with his stock to the intersection on the evening of the day he left Indiana. The stock-car was attached to a freight train shortly after its arrival at the junction, and Henderson waited at a public-house near, to take the passenger-car, which had not then arrived. This car was somewhat behind time; when it arrived the watchman of the company notified Henderson, who left the house and went on to the platform to get into the car, and whilst there for that purpose, and waiting till the train on which he was to go and which was moving slowly up, should stop, the fast line westward passed, struck him and killed him. The facts are stated more in detail in same case, 7 Wright 449.

The verdict was for the plaintiff for $3500.

The specifications of error following show the rulings of the court below in the admission of evidence and in charging the jury:—

The court erred in charging the jury as follows:—

1. " It was about eleven o'clock at night, and the freight train

[Pennsylvania Railroad Co. *v.* Henderson.]

to which the emigrant car was attached was from one-fourth to one-half hour behind time. The delay cannot be, however, alleged as a cause of action, as it is not the one laid in the declaration; still it is a circumstance bearing upon the cause on the question of negligence."

2. "The fact that they were behind time, however, is not laid in the declaration as the negligence complained of, but it may be considered as an element with others, as the probability is that if the freight train had been on time, a sufficient period would have elapsed to have enabled Henderson to enter the cars before the fast line came up, and thus entirely escaped danger."

3. "We therefore say to you, that if the agents of the company gave the necessary warnings and cautions which might with reasonable attention have been heard and seen by Henderson, he was bound to hear them, and if he did not, he was careless of his own safety, and if injured or killed it was the result of his careless disregard of those usual warnings, and she cannot recover it. * * * It is not whether he did know his danger or not. If he could have known it, with proper care, it is to be imputed to him that he did know,—whether the fact was so or not."

4. "A point has been raised that the endorsement upon the ticket operated as a release of this cause of action. We are not of that opinion. What the effect would have been if Henderson had been injured, and himself brought suit for such injury, it is not necessary to decide. This suit is brought by the widow, and her right of action cannot be affected by any discharge or release of Henderson in his lifetime. This is her action, not his or his representatives'."

5. In submitting the question of negligence to the jury, as there was no evidence at all from which it could be inferred.

6. In the answer to the defendant's sixth point, which point is as follows: "That if the railroad company had a safe and convenient station-house at the Blairsville intersection, it is the proper place where passengers waiting for the train should be, but if they leave such place of safety and attempt to reach the cars for the purpose of getting on while they are in motion, the company will not be responsible for any injury he may sustain in such attempt, and the plaintiff cannot recover in this action."

Answer: "The sixth point, particularly the first part, as a general rule is correct and affirmed. But if the jury believe this was at a late period of the night, and the station-house closed up, and if Henderson was at the house of Donnelly and informed by the watchman that he would notify him of the approach of the train, and he did so, and conducted him to the place where they were waiting for the freight train, then we think it would not be an act of negligence in Henderson not to be in the station-house. If, however, Henderson left a place of safety selected by the

watchman, and left it to enter the train while moving, it would be an act of carelessness. With this modification, the point is answered in the affirmative."

7. In the answer to the defendant's seventh point, which point is as follows: "That Henderson having released the company from any responsibility for injuries he might sustain, the plaintiff cannot recover unless gross negligence is proved on the part of the defendant, and that there is no evidence of such negligence in this case." Answer: "This point is answered in the negative. The endorsement on the ticket would not operate to release this action."

8. In the answer to the defendant's ninth point, which point is as follows: "That if the plaintiff is entitled to recover at all, it is on the ground of the pecuniary interest she would have in his life. That if Henderson was largely indebted at the time of his death, the plaintiff would have no pecuniary interest in his life until his debts were paid, and the jury in estimating the pecuniary value of the life of plaintiff's husband, must, if they can, fix on a period in his life, when if he had lived he would have acquired property beyond his debts." Answer: "We cannot answer this point to the extent demanded. His wife and family had an interest to the extent of their support at least. This point is answered in the negative."

9. The court erred in receiving the evidence contained in plaintiff's first offer, which is as follows: "Plaintiff proposes to prove by witness that Mr. Potts, the agent of the company, on the morning after Henderson was killed, was there, and directed the telegraph operator to telegraph Thos. A. Scott, general superintendent of the road, the situation of the platform, and that he thought it ought to be removed, and the operator replied, 'Very well,' and commenced on the apparatus, and that the platform was removed the next day."

10. The court erred in receiving the evidence as contained in plaintiff's second proposition, which is as follows: "Plaintiff proposes to ask the witness whether the attention of a passenger standing on the platform about to get on an approaching car would not necessarily be directed to the car he is about to enter."

11. The court erred in admitting the evidence as contained in the plaintiff's third offer, which is as follows: "Plaintiffs propose to ask witness from his knowledge of decedent's age, habits, health and physical constitution, how long he would have been useful to his family."

*H. D. Foster, J. C. Clarke* and *Stewart & Clark*, for plaintiffs in error.—The allegation of the declaration is that the defendants did not use care, &c., in allowing Henderson a safe platform or way and sufficient time to get on the cars, and, before he had

[Pennsylvania Railroad Co. *v.* Henderson.]

time to get on, negligently, &c., caused an engine to run past the car into which he was entering, which struck him and killed him. There is no evidence of want of care in running the express train, or of a platform safe in itself, but Henderson ran across the track and hence the injury.

Evidence, as stated in the ninth error, of what occurred after the accident is illegitimate, as the evidence should relate to what existed at the time. The evidence in the tenth error was of that which was a fair subject for argument but not for proof; witnesses may testify to facts, the jury must draw the inferences.

As to the eleventh error, compensatory damages only can be given; their measure is the pecuniary loss to his family: Pennsylvania Railroad Co. *v.* Zebe, 9 Casey 318; Same *v.* McCloskey, 11 Harris 526; Same *v.* Kelly, 7 Casey 372. Here, too, facts showing the condition, &c., of the deceased may be given in evidence, and the jury must draw the inference.

In the first and second errors the judge admits that the fact of the train being behind would not be negligence, for which plaintiff could recover because not alleged in the declaration, but allows it to be considered as a circumstance from which negligence might be inferred. Evidence should not be admitted of acts of negligence of which defendant had no notice, so as to meet them.

As to the third error, the court should have told the jury that the warnings given of the approach of the express train were such as would put a prudent man on his guard: Pennsylvania Railroad Co. *v.* Henderson, 7 Wright 449; Railroad Co. *v.* Aspell, 11 Harris 147.

The endorsement on the ticket is a release, unless in case of gross or wilful negligence: Pennsylvania Railroad Co. *v.* McCloskey's Adm'rs., 11 Harris 532. The burden of proving negligence is on the plaintiff: Camden & Amboy Railroad Co. *v.* Baldauf, 4 Harris 78.

The answer to the defendants' sixth point amounted to a negative answer, or is at least an evasion.

*H. W. Weir, William Banks,* and *James A. Getty,* for defendants in error.—It is not necessary that the declaration should specify each minute circumstance which constitutes the alleged negligence.

The sufficiency of the warnings was a question of fact, fairly submitted to the jury.

If Henderson had been injured and not killed, and he had sued, the endorsement would not operate as a release: Goldey *v.* Pennsylvania Railroad Co., 6 Wright 246; Powell *v.* Same, 8 Casey 414. But the endorsement could not release the right of the widow. In the analogous case of a widow's exemption claim, it

has been held that the husband's waiver cannot be enforced against his widow.

The removal of the platform immediately after the accident was evidence of its insecurity before, and proper to be submitted to the jury.

The measure of damages is the money value of the life and services of deceased: Pennsylvania Railroad Co. *v.* McCloskey's Adm'rs., 11 Harris 530; Same *v.* Vandever, 12 Casey 298; Same *v.* Zebe, 9 Id. 318. In actions involving damages the proof must necessarily be to some extent the opinions of witnesses, who might give their judgment here, how long the deceased would have been useful to his family.

The opinion of the court was delivered, May 15th 1866, by

READ, J.—This case was before the court in 1862, and is reported in 7 Wright 449. The court reversed the judgment below for errors in the charge in answering the third, fourth and fifth points of the defendant, and the chief justice said: "We cannot say that the defendant's sixth point ought to have been affirmed, because we do not perceive that the mere fact of going towards a moving train without leave is carelessness, nor are we convinced that there is any other error on the record." This decision disposes of the first, second, third, sixth and eighth specifications of error, and it would have been clearly error not to have submitted the question of negligence to the jury, which also answers the fifth specification of error in the negative, and we think there is nothing in the tenth specification of error.

The ninth error is not sustained, for it was clearly proper, after the evidence as to the placing of the platform, and its removal, and the similar evidence which followed the admitted evidence, which was the subject of exception, to show that the agent of the defendants, immediately after the accident, telegraphed the general superintendent of the road the situation of the platform, and that it ought to be removed, and that the platform was removed the next day.

The eleventh specification of error is identical with the first specification of error when this case was before the court before, and was then decided to have not been an error on the part of the court below to admit the evidence, as to how long the deceased would have been probably useful to his family, which point had been argued at length, orally and in their paper-book, by the counsel for the plaintiffs in error. But we still think there was no error in admitting the evidence; or, if an error, that it was immaterial in this case. The loss sustained by the plaintiff was a pecuniary one, and sustained by her, and arose from the value of the life of her husband to her and her family, and this value depended entirely on how long a man of his age and business

[Pennsylvania Railroad Co. *v.* Henderson.]

could be useful in supporting them. It was, therefore, a question of value upon which, whether of real or personal property, the opinions of competent witnesses have always been deemed advisable.

In Kellogg *v.* Krauser, 14 S. &. R. 137, nearly forty years ago, C. J. Tilghman said (p. 142): "The principal reason assigned by the plaintiff against this evidence was that *an opinion* of the value of land is not evidence, because it is not a fact. It is certain that such opinions are every day received as evidence, although it is true that an opinion is not strictly a fact, and it is difficult to conceive how the value of land can be proved without them. The witness may indeed prove the prices at which other lands in the neighbourhood were sold, but that would not ascertain the value of the land in question, without a comparison between it and the land which was sold as to quality, and quality is very much matter of opinion. It is a kind of evidence so often admitted without dispute or objection, that I have no doubt of its legality:" Brown *v.* Corey and Peterson, 7 Wright 506, per Woodward, J.

The same doctrine was maintained in Massachusetts in Vandine *v.* Burpee, 13 Metcalf 288, where the foregoing case is cited and relied on. "It seems to us," said Judge Dewey, "that it would be impracticable to dispense with this species of testimony in many actions of trover for personal property, where no detail of facts could adequately inform the jury of the value of the articles. The opinion of a witness as to the value of a horse is much more satisfactory evidence than a detailed statement of his size, colour, age, &c., to give the jury the requisite information to enable them to assess damages for the conversion of such a horse." This is reaffirmed in Walker *v.* The City of Boston, 8 Cushing 291; and in Shaw *v.* The City of Charleston, 2 Gray 107, Mr. Justice Dewey, delivering the opinion of the court, says: "It has now become the well-settled law of this commonwealth, that the value of property, real or personal, when in controversy, may be proved by the testimony of witnesses personally acquainted with the subject, and who are sufficiently familiar with it to give an opinion of its value."

The evidence in the present case was peculiarly pertinent, and we therefore agree with our former decision, that the court committed no error in admitting it.

The remaining error assigned is contained in the fourth and seventh specifications of error, and although the same evidence in relation to the endorsement on the ticket, and the alleged release, were in evidence on the former trial, the present objection was not taken. We shall, therefore, consider this question, because there are cases upon this subject in a sister state which demand a careful review, in order that our decision may be based upon sound principles.

1 P. F. Smith—21

[Pennsylvania Railroad Co. *v.* Henderson.]

In Baker *v.* Bolton and others, 1 Campbell 493, Lord Ellenboborough said: " In a civil court the death of a human being could not be complained of as an injury ;" and the same rule was laid down in the case of Carey *v.* The Berkshire Railroad Company, in 1 Cush. 475, as the doctrine of the common law. In Glassholm *v.* Barker, 12 L. T. R. N. S. 317, the Master of the Rolls, in a case of collision at sea, by which eight sailors lost their lives, said: " The history of the legislation on this subject is of considerable interest, showing, as it does, the progress of the legislation in adapting itself to the wants of society. Previous to the 9 & 10 Vict. c. 93 (Lord Campbell's Act), no action was maintainable against any person who by his wrongful act had caused the death of another. Injury to the person only created a right of personal action in the party injured, and if the injury was fatal, the right of action perished with that party. In that state of things Lord Campbell's Act gave a right of action against the wrongdoer to the legal personal representatives of the party killed, for the benefit of the wife, husband, parent or child of that person." After speaking of its effect upon collisions at sea, he said: " In 1846 Lord Campbell's Act, which I have mentioned, was passed. By that statute, after reciting that no action at law was then maintainable against a person who by his wrongful act, neglect or default, might have caused the death of another person — and it was oftentimes right and expedient that the wrongdoer in such case should be answerable in damages for the injuries so caused by him—it was enacted that whensoever the death of a person should be caused by wrongful act, neglect or fault, and the act, neglect or default was such as would (if death had not ensued) have entitled the person to maintain an action and to recover damages in respect thereof, then and in every such case, the person who would have been liable if death had not ensued, should be liable to an action for damages, notwithstanding the death of the party injured, and although the death should have been caused under such circumstances as amounted in law to felony. By the second section it was further enacted, that every such action should be for the benefit of the wife, husband, parent and child of the person whose death should have been caused, and should be brought by and in the name of the executor or administrator of the person deceased, and in every such action, the jury were empowered to give such damages as they might think proportioned to the injury resulting from such death, to the parties respectively for whom and for whose benefit such action should be brought. That act imposed no limit as to the extent of damages to be recovered in actions brought by virtue of it, and accordingly in cases of collisions at sea, the liability of the owners of the vessel in the wrong was measured by and limited to the extent of the injury inflicted."

[Pennsylvania Railroad Co. *v.* Henderson.]

The title of the act was " an act for compensating the families of persons killed by accident." There could be only one action, and that must be commenced within twelve calendar months after the death of such deceased person.

By a supplement of the 27 & 28 Vict. c. 95, passed 29th July 1864, it was enacted, if no such suit shall be brought by any executor or administrator within six calendar months after the death of such deceased person, then the action may be brought in the names of all or any of the persons interested, and shall be for the benefit of all; and as by the first act, the sum recovered is to be divided between the parties entitled in such shares as the jury shall by their verdict direct, the defendant is allowed to pay into court one sum as a compensation to all parties entitled without specifying the shares into which it is to be divided by the jury.

Under Lord Campbell's Act it was early settled in England, that the damages to be recovered were the pecuniary loss sustained by the family of the deceased, and did not include any of the damages that might have been claimed by the party injured if death had not resulted. It does not include the loss or suffering of the deceased, nor does it include the mental suffering of the survivor occasioned by such death, and it excludes all questions of exemplary damages. The damages are to be simply compensatory for the pecuniary loss sustained by the surviving family by reason of such death.

It is therefore an entirely different right of action from that which would have vested in the decedent if he had outlived the injury; but still the wrongful act, neglect or default, must be judged by those rules which have been established as to what constitutes such wrongful act, neglect or default. In Pym *v.* The Great Northern Railway Company, it being objected that the case did not come within the terms of the statute, Lord Chief Justice Cockburn said, " In support of the first of these grounds of objection, the language of the first section of the act was relied on, and it was contended that inasmuch as, if death had not ensued from the effects of the accident, the deceased would have had no right of action against the company in respect of a pecuniary loss arising only on his death, this action could not be maintained by his representatives, inasmuch as the right of action is given only when the deceased could have maintained an action if death had not ensued. We were at first struck with this argument, but on consideration we are of opinion, that the condition, that the action could have been maintained by the deceased if death had not ensued, has reference not to the loss or injury sustained but to the circumstances under which the bodily injury arose, and the nature of the wrongful act, neglect or default complained of. Thus, if the deceased had by his own negligence materially contributed to the accident whereby he lost his life, as he if still

living could not have maintained an action in respect of any bodily injury, notwithstanding there might have been negligence on the part of the defendants, the present action could not have been supported. But supposing the circumstances to have been such, that if death had not ensued, the deceased might have brought his action in respect of any injury arising to him from it, we are of opinion that his representatives may maintain an action in respect of an injury arising from a pecuniary loss occasioned by the death, although that pecuniary loss would not have resulted from the accident to the deceased if he had lived."

And it has been established, that if there be a reasonable expectation of pecuniary advantage, the extinction of such expectation by negligence occasioning the death of the party from whom it arose, will sustain the action.

This case was affirmed in the Exchequer Chamber, 10 Jur. N. S. 199. Erle, C. J., in speaking of two cases before decided, said, " In those cases, the sum in dispute was small. The parties deceased were in the habit of giving weekly contributions to a parent. I think the same order of events occurs here in substance."

I can find no case in the books in which a defence has been set up in England, that a passenger had contracted to exempt a railroad company from all liability under any circumstances, whether of negligence by its agents or otherwise, for any injury to his person, although it appears from the case of Pardington *v.* The South Wales Railway Company, 1 H. & N. 391, that according to the rules of that company, the drover's servant in charge of the cattle received a free pass from the company, and which was no doubt the rule on the other roads : Powell on Carriers 265–6. See 11 Jur. N. S. part 2, pp. 479, 487.

In Peck *v.* The North Staffordshire Railway, which was originally decided in the Queen's Bench, reversed in the Exchequer Chamber, and that decision reversed in the House of Lords, and the judgment of the Queen's Bench affirmed, reported in the 32 L. J. R. N. S. Ch. p. 241, 10 House of Lords Cases, p. 473, there is a very learned opinion of Mr. Justice Blackburn, giving an exhaustive view of the law in regard to the restrictions by common carriers of their common-law liability. He refers to Mr. Justice Story's Commentaries on Bailments, published in 1832, as furnishing a correct view of the decisions up to that time. " Still, however," says Judge Story, " it is to be understood that common carriers cannot, by any special agreement, exempt themselves from all responsibility, so as to evade altogether the salutary policy of the common law. They cannot, therefore, by a special notice exempt themselves from all responsibility in cases of gross negligence and fraud, or, by demanding an exorbitant price, compel the owner of the goods to yield to unjust and oppressive

limitations of their rights.   And the carrier will be equally liable
in case of the fraud or misconduct of his servants, as he would be
in case of his own personal fraud or misconduct."

" In my opinion," says Mr. Justice Blackburn, " the weight of
authority was in 1832 in favour of this view of the law ;  but the
cases decided in our courts between 1832 and 1854 established
that this was not the law, and that a carrier might by a special
notice make a contract limiting his responsibility even in the
cases here mentioned of gross negligence, misconduct or fraud on
the part of his servants, and, as it seems to me, the reason why
the legislature intervened in the Railway and Canal Traffic Act
1854 (17 & 18 Vict. c. 31), was because they thought that the
companies took advantage of those decisions (in Story's language)
' to evade altogether the salutary policy of the common law.'
Such is my opinion, but to maintain it I must examine the cases
in more detail."   This he does in 'the most satisfactory manner,
and his whole opinion and that of Lord Chief Justice Cockburn
deserve an attentive perusal.   Following the opinions of a major-
ity of the judges, the Lord Chancellor, Lord Cranworth, and Lord
Wensleydale agreed in opinion, Lord Chelmsford dissenting, that
the condition attempted to be imposed by the company was not a
just and reasonable one, and that it was the duty of a court or
judge so to declare; for if embodied in a contract its necessary
effect would be " that it would exempt the company from responsi-
bility for injury however caused, including therefore gross negli-
gence and even fraud or dishonesty on the part of the servants of
the company.   For the condition is expressed without any limita-
tion or exception."   Such is the law of England at the present
day, brought back to what was the original common-law rule by
Act of Parliament and the salutary decision of their court of the
last resort, the House of Lords.

The Supreme Court of the United States, in The Philadelphia
& Reading Railroad Co. v. Derby, 14 How. 468, which was the
case of a stockholder riding in a special car by the invitation of
the president and paying no fare, held: " When carriers under-
take to convey persons by the powerful and dangerous agency of
steam, public policy and safety require that they be held to the
greatest possible care and diligence, and whether the considera-
tion for such transportation be pecuniary or otherwise, the per-
sonal safety of the passengers should not be left to the sport of
chance or the negligence of careless agents.   Any negligence in
such cases may well deserve the epithet of ' gross.' "

In The Steamboat New World v. King, 16 How. 469, after
repeating the above passage, Mr. Justice Curtis says, p. 474:
" We desire to be understood to reaffirm that doctrine as resting
not only on public policy but on sound principles of law."   This
was the case of a steamboat waiter paying no fare, as was the

custom in such cases. Great doubt is thrown over the distinctions of slight, ordinary and gross negligence, and the inclination of the court is to reject them as useless in practice.

The same principle in different words, as to the duty imposed on the company carrying a passenger gratuitously, is affirmed in Nolton *v.* Western Railroad Corporation, 1 Smith (15 N. Y.) 445, although singularly the cases in the Supreme Court of the United States are nowhere alluded to by the court.

There are two grounds of liability on the part of common carriers, contract and duty, as in the case of the officer of the postoffice department in Collett *v.* London and North Western Railway Co., 15 Jur. 1053.

On the 13th December 1847 the legislature of New York passed an act framed after the English Act of 1846. The first section is nearly identical with the first section of the last-named act, omitting the preamble only. The second section provides for an action by the personal representatives of the deceased for the exclusive benefit of the widow and next of kin, and the damages from the pecuniary injury sustained by them to be given to them in the proportion provided by law in relation to the distribution of personal property left by persons dying intestate, the action to be commenced within two years after the death of such deceased person. By a supplement or amendment passed 7th April 1849, the amount to be recovered cannot exceed $5000: 4 N. Y. Stat. at Large, by Judge Edmonds, pp. 526, 527. The second section of the amendment provided for the punishment of persons in the employment of the company by whose wrongful act, neglect or default such death was caused.

A similar law was passed in New Jersey on the 3d March 1848, but without the limitation as to the amount of damages, and the action, as in England, was to be commenced within twelve calendar months, and on the 25th of March 1851 the state of Ohio passed an act similar to the New York act as amended.

In Wells *v.* The New York Central Railroad Co., 10 Smith (24 N. Y.) 181, the Court of Appeals of New York decided at March Term 1862, that a contract between a railroad company and a gratuitous passenger, by which the former is exempted from liability under any circumstances for the negligence of its agents, whether slight or gross, for any injury to the passenger, is valid. "Whether of negligence of their agents or otherwise," in the ticket, was held to mean the mere negligence of the agents of the company, and it did not extend to the acts of the directors or of the corporation itself. Sutherland, J., dissented, and his opinion, in which Judge Wright agreed, is certainly better reasoned than the opinion of the majority.

In Perkins's Administratrix against the same company, Id. 197, it was held that a railroad corporation cannot exempt itself from

[Pennsylvania Railroad Co. v. Henderson.]

liability to a passenger for damages resulting from its own wilful misconduct or recklessness, which is equivalent thereto. But in respect to a gratuitous passenger it may, for any degree of negligence in its servants other than the board of directors or managers. The words of exemption were the same as in the former case, but here the passenger was killed and the suit was by the administratrix of the deceased person.

In Smith, Administrator of Ward, v. Same Company, Id. 222, the drover in charge of the hogs who paid no separate fare, under a contract, "that the persons riding free to take charge of the stock, do so at their own risk of personal injury from whatever cause," is not a gratuitous passenger in the opinion of Judges Wright, Denio and Davies, being three of the permanent judges of the court elected by the whole people of the state. The carrier was held liable by a divided court, four of the judges going on the ground that the contract for exemption from liability was void, as against public policy, and the fifth, that the negligence, as it respected the machinery of transportation, is imputable to the carrier.

The opinion of Judge Wright is valuable for its sound reasoning, against the validity of such restrictions imposed by passenger carriers. The last case is that of Bissell v. Same Company, 11 Smith (25 New York) 442, in which the court held, in the same year (1862), that a common carrier might free himself from liability to a drover under a contract such as was stated in the last case, from risk of damage from the negligence of agents and servants. Chief Justice Denio and Judges Wright and Sutherland dissenting.

In no one of these cases are the arguments of counsel reported, and it is evident that the later decisions of the English courts were not referred to, and the very important case of Peck v. North Staffordshire Railway Co. had not then been decided, when the whole course of English decision was reviewed and criticised. They cannot therefore have the same weight to which under other circumstances they would be entitled. There is also another difficulty, made apparent by these cases, arising from the singular constitution of the court itself. Four permanent judges of the court are elected for eight years by the people of the whole state. There are thirty-three judges of the Supreme Court, a subordinate tribunal, elected in eight judicial districts—four in each district, except in the city of New York, which has five. These judges are also elected for eight years; and four of them are selected every year from the class having the shortest time to serve, to be judges of the Court of Appeals. So that the permanent judges have during their term of office eight different sets of associates, from an inferior court, vested with equal powers, and having an equal voice with them in the decision of every case. It is there-

fore impossible, with an annually fluctuating court, that there can be a uniform and consistent course of decision, commanding the confidence of the bar and the people.

Since this portion of my opinion was written, I have received from the secretary of state of the state of New York (General Barlow), the ninth report of the Commissioners of the Code of that state (Messrs. David Dudley Field and Alexander W. Bradford), containing the proposed Civil Code, and I am gratified to find the opinion of those able lawyers in relation to these decisions corresponds with my own.

In chapter V. of Common Carriers, art. 1, § 1141, p. 340, with a marginal reading, "Certain agreements void," it is declared, "A common carrier cannot be exonerated, by any agreement made in anticipation thereof, from liability for the gross negligence, fraud or wilful wrong of himself or his servants."

Then follows the commentary of the commissioners: "Pennsylvania Railroad Co. v. McCloskey, 23 Penn. St. Rep. 532; Camden and Amboy Railroad Co. v. Baldauf, 16 Id. 67; Smith v. New York Central Railroad, 29 Barb. 132, affirmed 24 N. Y. 222. The latest cases in this state seem to hold, that the carrier may be exempted from such liability for the acts of his servants: Bissell v. New York Central Railroad, 25 N. Y., reversing s. c., 29 Barb. 502; Perkins v. New York Central Railroad, 24 N. Y. 196; Wells v. Same, Id. 181. But these decisions were made by a bare majority of the Court of Appeals, and the commissioners think that the dissenting opinions are entitled to the most weight. It is notorious that the carelessness of railroad companies cannot be stopped by criminal prosecutions, and if they are enabled by a reduction of a few cents in the fare to escape a civil action, they will be practically irresponsible for the acts of their servants."

Upon looking at our own decisions, we can congratulate ourselves that we were never led away from the common law as understood thirty-five years ago, by the erroneous decisions of the English judges, which were finally corrected by Act of Parliament. On the 1st of April 1836, the legislature passed an act punishing criminally the gross negligence or wilful misconduct of drivers, conductors and engineers, whereby any person was injured, either in person or property. "This section," (the 29th section of the Act of 31st March 1860), "which is the revision of the Act of 1st April 1836, Pamph. L. 427, is intended more effectually to guard the community against the disastrous consequences, which too frequently attend the neglect and wantonness of those charged with the conducting of public vehicles, for the transportation of travellers and property." "As the like evils may result from the gross and wilful misconduct of steamboat officers, a provision has been introduced to meet such cases." The punishment is a fine

not exceeding five hundred dollars, and an imprisonment, by separate or solitary confinement, or by simple imprisonment, not exceeding five years.   This is, however, not to interfere with the civil remedies of the injured parties.

The 26th section of the Act of 31st April 1846, to incorporate the Pennsylvania Railroad Company (more than four months before Lord Campbell's Act), provides, "That if any person or persons travelling on the road of the said company, or that of any other company in this Commonwealth, shall be wounded by reason of any imperfection or defect in such road, or in the machinery or cars employed on the same, or by the negligence of such company or their agents, no action brought by such person or persons against such company to recover damages therefor shall abate by the death of the plaintiff or plaintiffs, but the same shall survive to his or her executors or administrators."

By the 18th and 19th sections of an Act of the 15th April 1851, Pamph. L. 674, no action to recover damages "for injuries to the person by negligence or default," shall abate by plaintiff's death, but his personal representatives may be substituted, and prosecute the suit to final judgment and satisfaction.   "That whenever death shall be occasioned by unlawful violence or negligence, and no suit for damages be brought by the party injured during his or her life, the widow of any such deceased, or if there be no widow, the personal representatives, may maintain an action for and recover damages for the death thus occasioned."

This section is very inartificially drawn, two things being only distinctly set forth, that the suit by the widow, if there be one, must be for her exclusive benefit, and that the damages to be recovered are for the death only, there being no limitation as to the period in which the suit must be commenced.   On the 26th April 1855, Pamph. L. 309, an act was passed relating to damages for injuries producing death, by which it was enacted, "That the persons entitled to recover damages for any injury causing death, shall be the husband, widow, children or parent of the deceased, and no other relative, and the sum recovered shall go to them in the proportion they would take his or her personal estate in case of intestacy, and that without any liability to creditors."   The declaration must state who are the parties entitled, and the action must be brought within one year after the death.   By a supplement of the 10th December 1856 (Pamph. L. of 1857, App. p. 798), the foregoing act was not to be construed retrospectively, either as to rights of action accrued or actions pending, but that the limitation of one year shall be restricted to cases occurring from and after the passage of said act.

In Pennsylvania we have always adhered to one rule with regard to the limitation of their liability by common carriers, from Beckman *v.* Shouse, 5 Rawle 179, decided on the 30th

March 1835, to Goldey *v.* Pennsylvania Railroad Company, 6 Casey 248, decided in 1858, a period of twenty-three years, and such is still the doctrine of our courts.   The last case was tried before the present chief justice, at Nisi Prius, and was argued by me in that court and in the Supreme Court, and upon looking at my paper-book, I find the latest English cases as well as our own were brought to the attention of the court.   The agreement or release in this case relieved the company from all responsibility for any injury to person or property in the transportation of live-stock, and the learned judge charged the jury that " the carrier is bound, notwithstanding such a contract, to use ordinary diligence, such as a man of common prudence ordinarily employs in his own concerns ; and if he fail in this and loss ensues therefrom, he is liable in damages.   This company, holding itself out as a common carrier, and professing to have a railway, cars and facilities for the transportation of live stock, were bound, even after the plaintiff had signed the release, by the rule of ordinary diligence and care.   The effect of the contract was to take away the insurance against all risks, to abridge their common-law liabilities, but not to excuse them for the want of ordinary care in the execution of the duty voluntarily assumed."   And Chief Justice Lowrie, in delivering the opinion of the court in banc, stated this proposition, that " a contract limiting their liability as carriers, does not relieve them from ordinary care in the performance of their duty ; and the most it can do is to relieve them from those conclusive presumptions of negligence which arise when the accident is not inevitable, even by the highest care, and to require that negligence be actually proved against them."

It is clear, therefore, if the cattle or sheep had been killed by the negligence of the agents of the company, the company would have been liable for the damage sustained by the owner.   The same doctrine is affirmed in broad terms by the present chief justice in Powell *v.* The Pennsylvania Railroad Company, 8 Casey 414, 416 : " Whoever has been attentive to the course of decision in this court for the last few years on questions between railroad companies and those whom they have injured in person or property, cannot have failed to observe that, on the one hand, we accept no excuse from the party who obstructs the track or interferes with the transportation of the company ; and on the other, that we hold companies bound to transport safely, or to respond in damages, except where the injury has resulted from the act of God or the concurring negligence of the party complaining."   In this case there was a similar release of the company from all claims for damage or injury to the stock, and the court said, " The ruling of the learned judge cannot be justified on the ground of the release signed by the plaintiff, because that has been held

[Pennsylvania Railroad Co. *v.* Henderson.]

to be no excuse for negligence. See Goldey's Case, 6 Casey 242, and cases therein cited."

"Assuming," says Chief Justice Lowrie, in Pennsylvania Railroad Company *v.* McCloskey's Administrators, 11 Harris 532, "that a public company of carriers may contract for other exemptions from liability than those allowed by law, still such contract will not exempt from liability for gross negligence." In this case the release by the drover exempted "the company from all liability for personal injury, however incurred."

In the case before us, on the back of the ticket issued to the drover in charge of the stock, and addressed to the conductor of the passenger car attached to the eastern bound stock train was this endorsement: "The person accepting this free ticket assumes all risks of accidents, and expressly agrees that the company shall not be liable, under any circumstances, whether of negligence by its agents or otherwise, for any injury to the person, or for any loss or injury to the personal property of the party using this ticket." Then follow the rules for issuing drovers' passes, one to either one or two car-loads of stock, two for not less than six, and four for ten car-loads or more.

As it is absolutely necessary, in carrying stock, that the persons who have charge of them should be carried by the company, the price paid for the freight includes the cost of transporting the drover, who is not therefore a gratuitous but a paying passenger, and the word "free" is therefore only true so far as that the conductor is not entitled to charge him separately for his passage.

This endorsement relieves the company from all liability for any cause whatever, for any loss or injury to the person or property, however it may have been occasioned; and our doctrine, settled by the above decisions, made upon grave deliberation, declares that such a release is no excuse for negligence.

The real negligence in this case was of the grossest kind, because the injury really resulted from most improperly placing the platform for passengers between the two tracks, at a point where the fast train passed at full speed without stopping; the cars on each track overlapping the platform, and leaving a very narrow space for the possible escape of a person on it. It was really caused by an imperfection or defect in the road, which was removed by the company as soon as this accident happened. Nothing can be so permanently dangerous as placing a platform for passengers between the two tracks of a railroad.

The learned judge, therefore, committed no error in ruling that the endorsement on the ticket did not release this cause of action.

The section recommended by the New York Commissioners would assimilate their law to very nearly our rule.

Judgment affirmed.